**Boris Wasilevitsky, Appellee, v. City of Chicago, Appellant.**

**Gen. No. 38,071.**

Heard in the first division of this court for the first district at the April term, 1935. Opinion filed June 17, 1935.

WILLIAM H. SEXTON, Corporation Counsel, and ALEXANDER M. SMIETANKA, City Attorney, for appellant; JOSEPH J. SULLIVAN and EDMUND J. MULCAHY, Assistant Corporation Counsel, SAMUEL ALLEN, LIONEL J. BERC and ROBERT E. DOWLING, JR., Assistant City Attorneys, of counsel.

MITGANG & BASKIN, of Chicago, for appellee.

MR. PRESIDING JUSTICE O'CONNOR delivered the opinion of the court.

Plaintiff brought an action against defendant to recover damages for personal injuries claimed to have been sustained by him through the negligence of one of defendant's employees in driving a garbage motor truck to which three trailers were attached.

May 22, 1934, there was a jury trial, and at the close of plaintiff's evidence defendant's motion for a directed verdict was sustained and a verdict rendered accordingly. June 2nd following plaintiff's motion for a new trial was allowed and the following November there was another trial and a verdict and judgment in plaintiff's favor for $6,000, and defendant appeals.

The record discloses that about eight o'clock on the morning of October 20, 1932, plaintiff, a peddler, was

putting some of his goods into his automobile parked in front of his home at 1448 North Campbell avenue, a north and south street, preparatory to departing for the day to peddle or sell his goods; he was at the curb side of the automobile when a garbage motor vehicle, to which were attached three trailers, was being driven south in Campbell avenue; the rear trailer, which was tipped toward the west, struck plaintiff's automobile with such force as to severely injure plaintiff.

Louis Kornfeind, called by plaintiff, testified that he saw the accident; that a truck to which were attached three trailers was being driven south in Campbell avenue; that one of the trailers seemed to be tipped over toward the west; that it struck plaintiff's automobile which was standing at the curb and threw plaintiff against the railing around the lawn in front of the house. Some man came along with a car, picked up plaintiff, who seemed to be unconscious, and took him to a hospital. He further testified that he lived about a half block from the scene of the accident and was out looking for a job; that after the collision the trailer "went down to about the middle of the block until he stopped after he hit the car"; that the words "City of Chicago" were on the side of the trailer.

Max Koltz, who lived at the same address as plaintiff, testified that he was plaintiff's landlord; that the accident happened about eight o'clock in the morning; that he was in front of his house coming back from the grocery store; that he saw a city garbage wagon with three trailers coming south in Campbell avenue "making a racket coming down there"; that he heard a crash; that one of the trailers struck plaintiff's car; that plaintiff was standing on the curb side of his car and was knocked down and fell against the railing around the grass parkway; that he was dragged about three feet; that witness walked over, picked plaintiff up and put him on a bench; that he rang a bell and plaintiff's son and wife came out and a salesman came

from a grocery store and took plaintiff in his automobile to a hospital; that it was a city garbage truck; that he thought it had letters on the side, "City of Chicago."

Bruno Borucki, who lived next door to plaintiff, testified that he saw the accident; that a garbage truck with three trailers came south on Campbell avenue; that the last trailer, which was tipped toward the west, struck plaintiff's car and he was knocked down and injured; that "a couple of fellows grabbed ahold of him and put him on a bench"; that "the trailers pulled up about seventy-five feet away south from the accident"; that on the side of the truck were the words "City of Chicago."

Plaintiff testified that at the time in question he was peddling "shoemakers' supplies" all over Chicago; that on the morning in question he parked his car in front of his house; that he was standing on the running board with his body inside the car putting merchandise, which he expected to sell that day, into the automobile; that the truck hit his car and he did not remember anything until he found himself in the hospital.

This was all the evidence as to how the accident occurred. The City called no witness except a draftsman, who testified to nothing concerning the accident. The City did not call the driver of the garbage truck or any other person and no explanation is made why he was not called, nor is there any evidence in the record as to what the driver of the truck did except that he stopped about 75 feet south of the place of the accident.

X-ray pictures of plaintiff are in the record. Dr. Diamond, who treated plaintiff, testified that he examined plaintiff on October 20th at the hospital, found he was tender on the left side of the chest, and ordered X-ray pictures taken, from which it appeared that plaintiff had sustained a fracture of the 8th, 9th, 10th,

and 11th ribs of the left side; that there were some bruises on the left leg below the knee and ankle. He further testified about certain percentages of displacements of the ribs; that the vertebrae and spinal column showed some arthritic changes; that plaintiff had some form of arthritis prior to the accident; that he gave plaintiff opiates and electric treatment; that he was in the hospital four weeks and was then taken home and confined to his bed four weeks more; that the patient then came to his office two or three times a week for about four months; that he was still coming on an average of about once or twice a month at the time of the second trial, which was in November, 1934, about two years after the accident; that he was of opinion that plaintiff's injured condition was permanent; that he rendered a bill of $425 and had been paid but $45 or $50.

Plaintiff testified that in his business as peddler he would visit about 80 or 90 customers once a week; that he kept a record of his daily sales and took in about $100 a day.

Defendant complains of instructions No. 6 and No. 8, given at plaintiff's request. Neither of the instructions is in the brief and we might therefore ignore the point. *General Platers Supply Co. v. L'Hommedieu & Sons Co.*, 228 Ill. App. 201; *Roy Iverson Co. v. U. S. Lloyds*, 251 Ill. App. 150. But the objection by defendant seems to be that each of the instructions "ignored the fact that the evidence showed that at the time of the accident the City was engaged in a governmental function," and therefore there was no liability. There is no merit in this contention. Whether the defendant City was operating a garbage truck and trailers in a governmental or ministerial capacity was a question for the court and not for the jury.

A further point is made by defendant that the judgment is excessive. We have above set forth the substance of the evidence as to the nature and extent of

plaintiff's injuries, which the doctor testified were permanent. He was confined to his bed about eight weeks, suffered four fractured ribs and other injuries, and incurred considerable expense in doctor and hospital bills. Upon a consideration of all the evidence we are unable to say that the verdict is so excessive as to warrant interference on our part.

Defendant makes a further contention that the evidence is insufficient to show ownership and operation of the truck and trailers by the City in the removal of garbage. We think this was a question for the jury. Plaintiff's evidence tended to show that the truck and trailers were used for the disposal of garbage by the City, and there was no evidence to the contrary. No attempt was made on behalf of the City to account for the failure to call the driver of the truck or any other witness.

Defendant further contends that even if the truck and trailers were being operated by the City for the removal of the garbage at the time in question, there was no liability because the City was engaged in a governmental function and therefore it was not liable for the negligence of its servant in driving the truck.

Whether the City was acting in a governmental capacity at the time in question, in which case there would be no liability, or whether it was acting in a ministerial capacity, in which case there would be liability, is a question not free from difficulty. Somewhat similar questions have been before the courts of this country on numerous occasions and the opinions and decisions are irreconcilable. And as pointed out by this court in *Bedtke v. City of Chicago,* 240 Ill. App. 493, we think the reason for such diversity of opinion has "arisen from a misconception of early law, the ordinary principles of the law pertaining to torts ought to apply to a municipal corporation; in other words, such a corporation, like any other principal, should be liable for the torts of its agents, and the

distinction between governmental and ministerial functions, used in determining the liability of a municipal corporation for negligence in affirmative conduct, should be abandoned. 34 Yale Law Journal, 229; 4 Dillon, Mun. Corp., p. 3002.

" 'Injuries caused by negligence of municipal employees are proper items of expense to be borne by the community. For omission to perform public duties running to the community as a whole there should of course be no municipal liability to private individuals. But in the undertaking of an affirmative course of conduct it is immaterial that the duty being performed is a public one from which the municipality derives no profit. Liability should be based upon the exaction of the law that everyone, in the performance of an affirmative course of conduct, must at his peril measure up to a standard of due care.' 34 Harv. Law Rev., p. 66."

In the *Bedtke* case we held that the City of Chicago was liable for the negligence of its servants in the use of a portable incinerator in an alley back of plaintiff's premises which caused the destruction by fire of certain personal property belonging to plaintiff. Certiorari was denied by the Supreme Court (241 Ill. App. XV). In that case we discussed a number of authorities, among them *Johnston v. City of Chicago,* 258 Ill. 494, in which it was held that the City was liable for an injury sustained by Johnston through the negligence of the driver of an automobile used to deliver books from the public library. The court there said (p. 497): "Counsel for appellant insist that the City of Chicago, in establishing and carrying on a public library, is simply exercising a public or governmental function as distinguished from a strictly municipal function, and therefore it is not liable for the negligent acts of its employees. . . . (499, 500). The organization of this public library is for the exclusive benefit of the territory of the City of Chicago and not

for the State at large. It has been organized by the people of that city, through their proper representatives, voluntarily, and the duties to be performed have not been thrust upon the people of said city *nolens volens*. . . . When a city under no obligation to light its streets voluntarily undertakes to do so, it has been held liable for negligence in the management of its corporate property when used for such purpose." And continuing the court said (p. 501): "In most jurisdictions in this country, however, a municipality is liable for failure to keep its streets in safe condition for public use. . . . This is the rule, as we have seen, in this State."

In *Hanrahan v. City of Chicago,* 289 Ill. 400, plaintiff was injured as a result of a wooden awning, which extended over the sidewalk, falling and striking him. It was held that the City was acting in its ministerial capacity in repairing or removing obstructions from the street and for any negligence in this respect it was liable. In that case the court discussed a number of authorities and said (p. 405): "Where a municipal corporation is acting, within its authority, in a ministerial capacity in the management of its property or in the discharge of its duties in repairing or removing obstructions from streets, or is negligent in failing to discharge its duties of keeping its streets in repair and in safe condition for travel, it is liable for all injuries caused by such negligence when the party injured is exercising due care for his safety. *Johnston v. City of Chicago,* 258 Ill. 494.

"A municipal corporation acts judicially when it selects and adopts a plan for the construction of a public improvement, but in carrying out such plan or in removing obstructions or dangers from its streets it acts ministerially and is bound to see that the work is done in a reasonably safe and skillful manner. (*City of Chicago v. Seben,* 165 Ill. 371.)"

In *Roumbos v. City of Chicago,* 332 Ill. 70, the City was held liable for the death of a child which was caused by its clothing having caught fire from a fire set by a street cleaner to a pile of rubbish he had negligently left burning without watching it. The court there said (p. 74): ''The division of municipal functions into public and governmental on the one hand and private and corporate on the other is not well defined, but is vague and indefinite. No definition of the terms has been declared which is of much practical value or 'which will precisely embrace torts for which a civil action will lie, in the absence of a statute declaring the liability against a municipal corporation.' . . . It has been said that all that can be done with safety is to determine each case as it arises.'' And continuing said (p. 75): ''The reason and essence of this rule is clear and easily to be understood, but its application to the specific cases is often of great difficulty. . . . (p. 76.) The grounds upon which the liability of the municipal corporation proper is usually placed are, that the duty is voluntarily assumed and is clear, specific and complete, and that the powers and means furnished for its proper performance are ample and adequate''; that if the work done was for the benefit of the ''general public (the people of the State at large)'' there was no liability ''but so far as their acts concern merely the interest of the particular locality and its inhabitants they are responsible, the same as private corporations. . . . 'The rule of law is a general one that the superior or employer must himself respond civilly for the negligence or want of skill of his agent or servant in the course or line of his employment by which another who is free from contributory fault is injured.' (2 Dillon on Mun. Corp., sec. 968.) The application of this rule to municipal corporations in cases of torts by their employees and servants tends more to the securing of justice than

the release of the corporations from the results which follow for private corporations or individuals.''

In *Gebhardt v. Village of LaGrange Park*, 268 Ill. App. 556, we held that the Village was liable for injuries suffered by a child through the negligence of the servant of the Village in driving an automobile which was used to transport children from the Village to a swimming pool located about seven miles outside the Village, which pool was being operated privately by a man and his wife. The basis of our decision was that since what was done by the Village was for the benefit of the inhabitants of the Village and not for the people of the State at large, the Village, in transporting the children to and from the swimming pool, was not acting in its governmental capacity. This holding was wrong. *Gebhardt v. Village of LaGrange Park*, 354 Ill. 234. One of the reasons for the reversal by the Supreme Court seems to have been that transporting the children to and from the pool was not specifically limited to the children of the Village. The court there said (p. 239): ''Among the aims of government are those to foster and promote health, comfort, recreation and sanitary conditions for the public, and unless specifically limited to certain classes of persons or to citizens of the Village itself such benefit extends to the public generally.'' The court there discussed the case of *Roumbos v. City of Chicago*, 332 Ill. 70.

Counsel for the City, in its brief, cite the case of *Consumers Co. v. City of Chicago*, 313 Ill. 408, and many other authorities and contend that the *Consumers* case is controlling here. In that case a bill was filed by a taxpayer against the City and its officials to restrain the purchase of a tract of land to be used by the City as a dumping ground for garbage and other waste matter; and it was contended that a city ordinance which authorized the purchase of the prop-

erty was invalid and that the City was limited by certain acts of the legislature. The question of the liability of a city for the negligence of its employees in the street cleaning department was not considered.

In a number of jurisdictions it has been held that the cleaning or sprinkling of streets or the removal of garbage is a corporate function to which the benefit to the public health is a mere incident, and that the municipality is liable for the torts of its employees engaged in such work. *City of Denver v. Porter,* 126 Fed. (C. C. A.) 288; *City of Pass Christian v. Fernandez,* 100 Miss. 76; *Missano v. Mayor of New York,* 160 N. Y. 123; *Silverman v. City of New York,* 114 N. Y. S. 59; *Quill v. New York,* 36 N. Y. App. Div. 476, 55 N. Y. S. 889; *Flannagan v. Bloomington,* 156 Ill. App. 162; *Ostrom v. San Antonio,* 94 Tex. 523, 62 S. W. 909; *Denver v. Maurer,* 47 Colo. 209, 168 Pac. 857.

There are authorities holding to the contrary on the theory that cleaning streets and the removal of garbage are health measures and are therefore governmental. But, so far as we are advised, the collection and removal of garbage even as a health measure has never been adopted as a function of the general government. If a State does not owe the duty to the public to remove garbage, it is not clear how a municipality can be its agent exercising the delegated powers of the State in its performance. In the cases just cited it is held that the removal of garbage is directly for the benefit of the city's residents in which the State, if at all, has only an indirect interest—a secondary consideration. We think this latter view is in accordance with common sense and sound reasoning and in line with the authorities of our own State, some of which are *Johnston v. City of Chicago,* 258 Ill. 494; *Bedtke v. City of Chicago,* 240 Ill. App. 493—certiorari denied by the Supreme Court, 241 Ill. App. XV—and *Roumbos v. City of Chicago,* 332 Ill. 70.

We might also say, as evidencing the tendency of Illinois in holding municipalities liable for injuries caused by the negligence of its employees, that the legislature in 1931 passed an act making municipalities liable for injuries caused by the negligence of its firemen in the operation of a motor vehicle in the performance of their duties. (Par. 987(1), ch. 24, p. 593, Cahill's 1933 Stats.) Heretofore we think it had been almost uniformly held that municipalities were not liable for injuries to persons caused by the negligence of its firemen, while engaged in the performance of their duties as such.

The judgment of the circuit court of Cook county is affirmed.

*Judgment affirmed.*

McSURELY and MATCHETT, JJ., concur.