**Miralago Corporation, Appellant, v. Village of Kenilworth, Appellee.**

**Gen. No. 39,213.**

Opinion
filed May 10, 1937., Rehearing denied May 24, 1937.

URION, BISHOP & SLADKEY, of Chicago, for appellant; HOWARD F. BISHOP and JEROME J. SLADKEY, of counsel.

SCHUYLER, WEINFELD & HENNESSY, of Chicago, for appellee; ALLAN T. GILBERT and JAY STOUGH, both of Chicago, of counsel.

MR. PRESIDING JUSTICE MATCHETT delivered the opinion of the court.

In an action on the case, at the close of all the evidence the court instructed the jury to return a verdict for defendant and entered judgment on the verdict, from which plaintiff appeals. The amended declaration contains seven counts, which in substance charged that defendant wrongfully shut off the water supply from plaintiff's premises on March 8, 1932, whereby the building situated thereon was burned. Three of the counts charged that the act of defendant was wilful, wanton and malicious.

It is contended the court erred in directing a verdict for defendant, in denying plaintiff's motion for a new trial and in excluding evidence offered by plaintiff. The controlling question in the case, and the only question which it will be necessary to consider, is whether the evidence excluded and received would have authorized the jury to return a verdict for plaintiff.

Facts proved and offered upon the trial and admitted by the pleadings may be summarized as follows: March 8, 1932, "No Man's Land" was an unincorporated area of about 25 acres of land north of Chicago, lying on the north lake shore and immediately south of the village of Kenilworth. In this area of No Man's Land the Foreman Trust and Savings Bank, as trustee, was the owner of a large building, the first and second floors of which had been leased to the plaintiff, Miralago Corporation, for use as a restaurant and ballroom. Under the terms of the lease plaintiff made certain repairs on the premises.

March 8, 1932, at about 4:30 p. m., the building on the premises caught fire. It stood on Sheridan Road

about 100 yards south of the boundary line of the defendant village, and about the same distance from a hydrant of the village, located on the northwest corner of Sheridan road and 10th street. Upon discovery of the fire the employees of plaintiff called the fire department of Evanston, which arrived with its equipment about five o'clock. In a few minutes the Evanston department unrolled its hose and got in position; there was a dead plug in No Man's Land immediately south of the Kenilworth plug, to which the firemen at first hooked their hose. Mr. Summers, a police officer of defendant village, suggested the fireman should attach the hose to the Kenilworth plug, saying, "Come over here. That plug is dry. Hook up here." At this time practically no damage had been done by the fire. The Evanston firemen then hooked to the Kenilworth hydrant and began the use of water and continued to use it for about half an hour, at which time, plaintiff's witnesses say, the fire was "practically killed" and would have been extinguished in a few minutes if the water supply had been continued. At this time, however, two police officers of defendant village, accompanied by the village manager, Mr. Streed, shut off the water at the Kenilworth hydrant, using a long-handled wrench in an underground valve outside the hydrant. There was no fire in the defendant village at this time requiring use of water. The evidence tends to show that the village manager stated, "We have let you have the water long enough" or "You have used the water long enough." The firemen uncoupled the hose and rolled it up. From 30 to 45 minutes later Mr. Clark, the village clerk, told Chief Hostetter of the Evanston fire department that he could now have water, and that it would not again be shut off. The evidence shows that it was a cold day; the thermometer was about zero; the hose and joints were frozen and required thawing out with hot water; it took some time to thaw out the equip-

ment and by the time the hose was again connected the fire had gained such headway that the building was burned to the ground, including all the property of plaintiff, notwithstanding the efforts of the Evanston firemen to save it.

The evidence tends to show that the village manager of defendant first heard of the fire about 4:45 p. m.; that he was then in the village office in a room occupied by himself, the chief of police and police captain, whose desks were near each other; that the village manager discussed the fire with officer Bradley, who 'phoned him from the scene of the fire at about 5:10 or 5:15 p. m.; that shortly before or after this conversation with Bradley Manager Street talked with William Demetreon, the proprietor of a barbecue stand adjoining the Miralago building. Before talking to them he spoke to Arne Mark, engineer in charge of defendant's water pumping station. After this conversation Bradley came from the scene of the fire to the village office. At about 5:15 Streed left for the fire. A memorandum on the police docket, with the time notation 5:15 p. m., shows that the Evanston Fire Department arrived at 5:00 p. m. Plaintiff called Manager Streed as a witness for cross-examination under the Civil Practice Act, Ill. State Bar Stats. 1935, ch. 110; Jones Ill. Stats. Ann. 104.001 *et seq.* Other of the employees of the defendant village were also called. Streed said he did not recall that he was told the water was being used, but admitted that in prior testimony he said that the officer called and told him it looked as though the Evanston fire department was using defendant's water for fighting the fire. Bradley testified that when he called the village office at 5:15 he "thought probably they were using water," and admitted giving testimony to that effect in his deposition given at a prior time. Arne Mark, engineer in charge of the water works, testified that Streed told him, "if necessary I should

go down and shut the water off," and "he said he thought they might want to use it for the fire." The pumps at the water station controlling the pressure in the water tank and the amount of water in the tank were shut off at around 4:15 o'clock by order of Manager Streed. The records of the pumping station show that the pumps were again started by hand at 5:15 p. m., were shut off again at 6:00 p. m., and turned on again at 6:20 o'clock. The manager of defendant sent a bill in favor of the village to the Foreman Trust & Savings Bank, as trustee, for the sum of $240.02 on account of the water used. The bill read, "Water furnished for fighting fire." The owner of the building paid $100 on account of this bill. A letter which accompanied the bill stated:

"We are enclosing . . . our bill . . . for water furnished for fighting fire. . . . It is our regular policy not to operate our water plant in winter between dusk and dawn. . . . At the time the call for water came, our plant was shut down for the night and when it was decided to furnish water for this fire it was necessary to start our pumps again. . . ."

Computation of the amount due for furnishing this water was made by Ley, the water superintendent, by direction of the manager, and he was told to compute the charge from the time permission was given to use the water. Computation indicates that permission for the use of the water was given at 5:30 p. m. There was evidence from which the jury could have found that Streed, the manager, knew about the permissive use of the water, and that he was responsible for turning it off. There was also evidence tending to show the fair cash market value of the items on account of which damage is claimed by plaintiff amounted to $76,451.13.

The briefs of the parties discuss at length and with numerous citations of authority the question of whether defendant, in furnishing water to plaintiff through its hydrant, exercised a governmental or pri-

vate function. Plaintiff argues that defendant acted in a private capacity and is therefore liable upon the same principles that would be applied in the case of a private owner. Defendant contends that extinction of a fire by a municipal corporation is the performance of a governmental function for which it cannot be held liable on account of the negligent performance thereof. Plaintiff relies on *Roumbos v. Chicago,* 332 Ill. 70, where the court said that in the determination of the responsibility of a municipal corporation in such cases the inquiry should be whether the agents, by reason of· whose alleged negligence liability of the municipality was predicated, were performing a public duty imposed by law or carrying out private functions which were for its special benefit or advantage, the principal question being not necessarily whether the municipality would derive a pecuniary advantage, but whether the transaction affected primarily the interest of the locality and its inhabitants or the general public. Plaintiff also cites cases such as *People v. Schlitz Brewing Co.,* 261 Ill. 22; and *Wagner v. City of Rock Island,* 146 Ill. 139, each of these cases holding that (under the circumstances there appearing) where a municipality under the statute furnishes water and constructs and operates water works, it does so in a proprietary rather than a governmental capacity. Other cases which it is argued so hold are *Springfield Gas & Electric Co. v. City of Springfield,* 292 Ill. 236; and *Eastern Illinois Normal School v. City of Charlestown,* 271 Ill. 602.

The brief of plaintiff asserts a tendency in the cases in the direction of sweeping away distinctions between the activities of the municipalities in these respects in so far as their liability in tort is concerned. It is argued that under the facts defendant is liable upon either theory. Plaintiff says that defendant confuses the fact that the water furnished *was used to extinguish* a fire with its own interpretation *that defendant was engaged in extinguishing a fire.* Plaintiff says defend-

ant was not extinguishing a fire but selling water. The only purpose of showing the use of the water is in order that the amount of damages might be ascertained and determined. The water, says plaintiff, might just as well have been used to supply a truck garden or a hospital or any other institution, and if the arbitrary cutting off of the water in the one case resulted in the death of a patient, or, in the other the loss of crops, defendant would be liable but not upon the theory that defendant was conducting a hospital or engaged in horticulture. The point, so it is contended, is illustrated by the case of *City of Chicago v. Selz, Schwab & Co.*, 202 Ill. 545, where the city was held liable for water damage to plaintiff's stock of goods, resulting from the breaking of a connection at the bottom of a fire hydrant, which blew out a pipe, permitting the water to rush into the basement where the goods of plaintiff were stored. The Supreme Court held the city liable upon the theory that the city conducted the water system of which the hydrant was a part, both in its private and corporate capacity; that the water system was not used exclusively for a public function in putting out fire under the exercise of the police power; that if the break resulted from the negligence of firemen engaged in the line of their duty in putting out fires, the city would not have been liable, but since the break was not from that or any other similar cause, the city might be held guilty. The plaintiff says: ''An examination of this case and these rulings makes it clear that the reason why the city was held liable in the Selz, Schwab case was, First, the fire hydrant was a source of income; Second, the fire hydrant was not being used in putting out a fire under the exercise of a police power; and, Third, the break did not result from the negligence of firemen engaged in the line of their duty in extinguishing a fire.''

Applying these rules to this case it is argued defendant is liable because, first, the supply of water from

this hydrant was a source of income to defendant. The water was not supplied without charge. Second, the water was not used, for public protection in the exercise of the police power. The defendant, it is said, could not exercise this power outside its territorial limits. Third, negligence charged against defendant was not by defendant's employees in the line of their duty as firemen. Fourth, the wrongful acts of defendant were malicious.

It is contended that whether defendant knowingly permitted the use of the water, the affirmative act of defendant in shutting it off was tortious. Plaintiff invokes the rule that wherever a person is put in such a position in regard to another that it is obvious that if he does not use care in his own conduct he will cause serious injury, the duty arises to use care commensurate with the situation, and that for the negligent failure to perform that duty he will be liable in damages. In this connection are cited *DePue v. Flatau,* 100 Minn. 299, where the defendant was held liable to a cattle inspector who, when ill, was refused permission to stay over night at the home of the defendant farmer and was by him sent on his way in inclement weather, whereby he was nearly frozen to death. *Metallic Compression Casting Co. v. Fitchburg R. Co.,* 109 Mass. 277, where a railroad company drove a freight car over the hose a fire company had placed across the track, thus damaging the hose to such an extent as to cause the loss of plaintiff's building by fire. *Clark v. Public Service Co.,* 278 Ill. App. 426, where the defendant was held liable in tort at the suit of plaintiff, whose residence was destroyed by fire as a result of defendant who, arbitrarily and after the fire started, removed its meter and cut off its service wires, thus preventing plaintiff from using an electrical water pump, whereby for lack of water the building of plaintiff was destroyed by fire. *Mullen v. Otter Tail Power Co.,* 130 Minn. 386, where, although there was no contractual relationship,

a defendant was held to be under a duty not to cut off the supply of electrical current arbitrarily, whereby plaintiff was left without light needed to remove stock and fixtures from a burning building. Plaintiff also calls attention to a suit by two men against a steamship company, who, plaintiffs alleged (they being on a raft in midocean) were observed by the ship, which did not pick them up when requested so to do. Plaintiff says:

"If the original use of water was not tortious, then the deliberate discontinuance without notice must be actionable, regardless of official permission or notice of such use. This, then, is true whether or not the village authorities permitted the use of the water initially or whether or not they had notice of the permission that was given by the police officers, and the discontinuance of the supply under the circumstances must constitute either negligence or more probably wilfulness and wantonness." It will be noted that in none of these cases was the defendant a municipal corporation, a circumstance which, as we hold, creates a distinction which is vital and controlling.

The further contention is made that even conceding that in furnishing this water defendant was exercising a governmental function, there was evidence which should have been submitted to the jury on the theory that the injury to plaintiff was wantonly and wilfully inflicted with malice. Plaintiff cites a number of cases, which we have examined and find that no one of them sustains the theory that where the injury to plaintiff came through the exercise of a governmental function, a defendant municipality could be held liable even if the damage was wanton and wilful or even malicious. Plaintiff cites *City of Chicago v. Seben*, 165 Ill. 371, which simply holds that where a city exercises the duty of constructing a sewer, it is liable to a party damaged for doing the work negligently. *Lee v. Village of Sandy Hill*, 40 N. Y. 442, where the general principle that a city is liable for both nonfeasance and misfeas-

ance is stated. A note in 69 L. R. A. 516, "D," is also cited, but states only the general rule that contributory negligence will not bar an action for wilful and wanton negligence. *Hart v. Freeholders, etc.,* 57 N. J. L. 90, also cited, states the rule of liability where a municipality vacates or obstructs a public street to the special damage of an individual owner. *Keho v. Borough of Rutherford,* 74 N. J. L. 659, considers the liability of a municipality for negligence in constructing artificial drains to the injury of land holders. *Renstrom v. City of Nampa,* 48 Idaho 130, 279 Pac. 614, considers the liability of a city for negligence causing an overflow of water during freezing weather, whereby ice was formed in the street. Plaintiff also cites 45 C. J. 679 and McQuillin on Mun. Corp., sec. 2792, but neither authority sustains the contention that a municipality, exempt by reason of exercising a governmental function, may be subjected to liability by reason of proof that the negligence was wilful and wanton or even malicious.

Finally the plaintiff insists that the tendency is quite uniform to depart from the old theory of nonliability of cities for negligence in the performance of governmental functions, to which he cites 34 Harvard Law Review, p. 67; *Workman v. New York,* 179 U. S. 552; *Highway Trailer Co. v. Janesville Electric Co.,* 178 Wis. 340; *Wasilevitsky v. City of Chicago,* 280 Ill. App. 531; Jones Ill. Stats. Ann., vol. 15, ch. 85, sec. 85.072. To this contention we shall later give consideration.

In the first place defendant denies that it was in fact furnishing water to plaintiff at the time in question. The water, it is said, was furnished to and used by the Evanston fire department, not plaintiff. Members of the Evanston fire department, however, in this case acted in behalf of plaintiff and if defendant was otherwise liable, we think it could not escape upon that theory. Neither can we agree, as defendant contends, that there was no duty upon defendant after volun-

tarily assuming the duty of furnishing water to continue to furnish it while it was needed to put out the fire. However, assuming all this, there remains for consideration the controlling question of whether defendant, a municipality, can be held liable under the facts here disclosed. In the exhaustive briefs submitted, the parties have cited innumerable authorities from this and other jurisdictions which undertake to define under what circumstances a municipal corporation will and will not be liable for the negligence of its servants and employees. The authorities are in hopeless conflict, although the courts of Illinois have been disposed to adopt a more liberal rule in the direction of liability than some other jurisdictions, and it may not be denied that within certain exceptions the tendency of the decisions has been in the direction of holding the municipality liable. Illustrative is the case of *Hanrahan v. City of Chicago,* 145 Ill. App. 38, as compared with the later case of *Hanrahan v. City of Chicago,* 209 Ill. App. 630, which was affirmed by the Supreme Court in 289 Ill. 400. In those cases the Hanrahans, father and son, were injured by the falling of an awning which was permitted to project over the street on which they were walking. They brought separate actions, filing declarations which, except as to the names of the plaintiffs, were identical. The case of the father was tried first. He obtained a judgment which was reversed by the Appellate Court on the theory that the city acted in a governmental capacity. In the case of the son, tried later, the plaintiff also obtained a judgment which was affirmed in this court, the court holding that the city acted in a ministerial capacity. The opinion relied on *Johnson v. City of Chicago,* 258 Ill. 494, which in the meantime had been decided by the Supreme Court holding that in conducting a library the city was acting in a ministerial capacity and therefore liable to one injured by a servant of the library negligently driving a wagon. Upon the same

reasoning in the later case of *Gebhardt v. Village of LaGrange Park*, 268 Ill. App. 556, this court affirmed a judgment for personal injuries obtained by a minor against a municipality, because of the alleged negligence of the servant of the municipality, in the operation of a bus carrying children to a swimming pool. The authorities cited were *Roumbos v. City of Chicago*, 332 Ill. 70; *Bedtke v. City of Chicago*, 240 Ill. App. 493; *Johnston v. City of Chicago*, 258 Ill. 494. We quoted with approval from the *Bedtke* case:

"In our judgment, bearing in mind that the present ill-defined doctrine seems to have arisen from a misconception of early law, the ordinary principles of the law pertaining to torts ought to apply to a municipal corporation; in other words, such a corporation, like any other principal, should be liable for the torts of its agents, and the distinction between governmental and ministerial functions, used in determining the liability of a municipal corporation for negligence in affirmative conduct, should be abandoned. 24 Yale Law Journal, 229; 4 Dillon, Mun. Corp., p. 3002."

The Supreme Court, however, did not approve, and in *Gebhardt v. Village of LaGrange Park*, 354 Ill. 234, reversed the judgment of this court. The Supreme Court, after pointing out the conflict of authority in different States, said:

"The principle upon which freedom from liability for damages occasioned by the servants of a municipality is based, rests, in turn, on the fact that the duty of the municipality is owed to the public, and though the neglect causing the injury may prove of damage to the individual affected, the benefit of the discharge of such function to the public generally is deemed an outweighing consideration and so justifies immunity to the municipality. (*Hill v. Boston*, 122 Mass., 334, 23 Am. Rep. 332.)"

In the later case of *Wasilevitsky v. City of Chicago*, 280 Ill. App. 531, this court held the city was liable to

the plaintiff, injured by the negligent operation of a garbage truck owned and used by the city. We again reviewed the cases and said that the later view of liability was in accordance with sound reasoning and called attention to the statute making a municipality liable in some cases to persons injured by the negligence of firemen. Cahill's 1933 St. ch. 24, ¶ 987 (1), p. 593. In the later case of *Schmidt v. City of Chicago,* 284 Ill. App. 570, the second division of this court reviewed the authorities from this and other States.

It is apparent from the *Gebhardt* case that the Supreme Court of this State adheres to the distinction between acts done in a governmental as distinguished from a proprietary capacity, or a public as distinguished from a private or corporate capacity. The reason for adherence to the distinction, notwithstanding the difficulty of stating a definite rule which may be generally applied, is the public danger that in this class of cases liability of the municipality would impose upon the taxpayers damages which might prove so onerous as to destroy the municipality itself. The real basis of the rule which exempts the municipality from liability in cases of this character is, we think, public policy which forbids that the municipality, an arm of the sovereign government, should be subjected to liability in damages of this sort.

In *Roumbos v. City of Chicago,* 332 Ill. 70, the Supreme Court, quoting with approval from *Wilcox v. City of Chicago,* 107 Ill. 334, said:

"To allow recoveries for the negligence of the fire department would almost certainly subject property holders to as great, if not greater, burdens· than are suffered from the damages from fire. Sound public policy would forbid it, if it was not prohibited by authority."

In *Springfield Fire & Marine Ins. Co. v. Keeseville,* 148 N. Y. 46, 51 American State Reports, 667, the court said:

"The proposition that such a liability rests upon a municipal corporation, as is asserted here, is somewhat startling, and I think the learned General Term justices have misapprehended the nature of the responsibility, which devolved upon the defendant in connection with its maintenance of a water works system, as well as the character of the power which it was authorized to exercise in relation thereto. I might remark, in the same spirit of criticism which was assumed by the learned justice at General Term, that while the efficiency of the public service would be promoted by holding municipal corporations to the exercise of reasonable care and diligence in the performance of municipal duties, and to a liability for injury resulting from a failure in such exercise, the application of that doctrine to such a case as this might, and probably would, be highly disastrous to municipal governments. A little reflection will show that a multitude of actions would be encouraged, by fire insurance companies, as by individuals, and that cases have arisen, and may still arise, where an extensive conflagration might bankrupt the municipality, if it could be rendered liable for the damages or losses sustained."

The facts of this case bring it within the reason of the rule which exempts a municipality from liability for damages arising in such cases. If this suit were by a resident and taxpayer within the village for a similar wrong, there could be no recovery. We think plaintiff, residing without the village, is for like reasons precluded. There is no case in the books which has been called to our attention which is precisely like the instant case, or which may not easily be distinguished from it. We hold, however, that the liability which plaintiff seeks to enforce against this municipality is of a nature forbidden by public policy; that the obligation which it is claimed was undertaken by the municipality to furnish water to fight a fire was

of such a nature that the law forbids liability for negligence in connection therewith, and that any act by which such liability might be imposed upon the municipality was ultra vires. We hold (assuming that all evidence offered should have been admitted) the trial judge was warranted in instructing the jury to return a verdict for the defendant. The judgment entered upon that verdict is therefore affirmed.

*Affirmed.*

O'CONNOR, J., concurs.

McSURELY, J., concurs in holding that the judgment should be affirmed.