## BARRETT CO. v. BOBAL.
### No. 6540.

Circuit Court of Appeals, Sixth Circuit.
Jan. 8, 1935.

---

C. M. Horn, of Cleveland, Ohio (McKeehan, Merrick, Arter & Stewart, of Cleveland, Ohio, on the brief), for appellant.

Jesse Stephens and William Gordon, both of Cleveland, Ohio (Stephens, Verhunce & Stephens and William Gordon, all of Cleveland, Ohio, on the brief), for appellee.

Before HICKS, SIMONS, and ALLEN, Circuit Judges.

HICKS, Circuit Judge.

Action by John Bobal, administrator of the estate of John Hurajt, against the Barrett Company, a New Jersey corporation, to recover damages for his death. Judgment for plaintiff. Defendant appealed and complains (1) of the denial of a directed verdict; (2) of error in the charge; and (3) of the exclusion of evidence.

Appellant was a manufacturer of Tarvia, a coal tar product designed for use upon highways. On February 23, 1932, it contracted with Cuyahoga county, Ohio, to furnish the county 50,000 gallons of its product. The contract was embodied in a bid by appellant and its acceptance for the county and provided that the Tarvia was to be "delivered and applied in pressure distributors * * *," to be furnished by appellant.

One of these distributors, herein called a tank, was delivered by appellant to the county in April or May, 1932, and from then until the accident, July 27, 1932, was in the possession and under the control of the county's road repair department. This tank was one of a number which had been built for appellant in 1917 and had been used for the heating and application of Tarvia more or less continuously from that date. It was built of ¼ inch steel plate, was cylindrical in shape, 8 feet 10 inches long, and 42 inches in diameter with heads of 5/16 inch openhearth, tank-steel plate. It was made to withstand inside pressure of from 240 to 300 pounds, was mounted on a chassis, and was conveyed from place to place by the county's motortruck.

As Tarvia was required, it was transported, while hot, to the job in a large metal tank and was forced therefrom into the distributor tank through a hose line. Thence it was applied to the surface of the highway by the county's employees by means of a spraying device attached to the rear end of the tank. On account of its low viscosity, it was necessary to maintain the Tarvia at a high degree of temperature and to force it through the spraying attachment with compressed air. Heat was applied through jets from a kerosene burner located underneath the front of the tank and air supplied through a hose connected with a pump stationed upon a nearby county truck.

The tank was not provided with either a thermometer or a level gauge, but in our view the lack of these devices is not controlling. Some time after the purchase of the tank, appellant supplied it with a safety or escape valve which was inserted through the steel at the top and near the front end. This valve was set to "pop off" at 15 pounds and its function, of course, was to relieve the inside of the tank of excessive pressure.

The tank had been in almost continuous service from the time appellant delivered it until the accident. The road repair work was in charge of two crews, alternating weekly, each under a foreman. On the morning of the accident one of these crews, under Foreman Moritz, was using the tank on the "River Road" at the foot of Morosky Hill, the grade of which was about 15 per cent. At 11:30 it was pulled up the hill by a county truck and left standing upon the road with its front end about 18 inches higher than its rear. It was then nearly empty and whatever remained of its contents flowed to the rear end. The crew stopped for lunch, and when resuming work at noon, one of the workmen lit the burner under the front end of the tank and it continued to burn until about 1:15. In the meantime the air com-

pressor was operating at its registered pressure of 35 pounds. At 1:15, just as the operators in charge were about to commence spraying, the tank exploded with terrific force. The rear end was blown out, and struck and killed Hurajt, who was then at work upon the road nearby.

The tank was overturned and an inspection disclosed a reddish burned area, elliptical in shape, and about 18 to 20 inches in length and 8 to 10 inches in width upon that portion directly over the kerosene burner. The safety valve was in place, but its opening was found to be completely obstructed by a cast-iron plug. Both the opening and the plug bore threads by means of which the plug had been screwed into the opening, and the presence of which made it impossible for the valve to operate. The evidence tends to show that the heat from the burner applied to the empty front part of the tank caused the Tarvia that was left to vaporize with the compressed air into a mixture which exploded when the heat became sufficient to ignite it; and that, if the valve had been working, the pressure would have been relieved and the explosion averted.

■ Upon its motion for a directed verdict appellant's point was that under the contract it was obligated to the county only; that it owed no duty to the decedent to provide an unobstructed safety valve; and that, even if it did, there was nothing in the evidence to indicate that the plug was in the valve opening when the tank was delivered to the county.

We cannot accept this view. Appellant knew that the tank would be used not only on level ground but upon hillsides and that without a sufficient safety valve it was, while in operation, "a thing of danger" to those who were required to work near it and yet had no control over it.

The legal principle is stated by Judge (now Mr. Justice) Cardozo in MacPherson v. Buick Motor Co., 217 N. Y. 382, 389, 111 N. E. 1050, 1053, L. R. A. 1916F, 696, Ann. Cas. 1916C, 440, as follows: "If the nature of a thing is such that it is reasonably certain to place life and limb in peril when negligently made, it is then a thing of danger. Its nature gives warning of the consequences to be expected. If to the element of danger there is added knowledge that the thing will be used by persons other than the purchaser, and used without new tests, then, irrespective of contract, the manufacturer of this thing of danger is under a duty to make it carefully."

In Goullon v. Ford Motor Co., 44 F.(2d) 310, we stated that the opinion in the Mac-Pherson Case "has been repeatedly followed and has now become the generally accepted law." See, also, Johnson v. Cadillac Motor Car Co., 261 F. 878, 882, 8 A. L. R. 1023 (C. C. A. 2).

It is true that appellant did not sell the tank to the county. It did, however, supply it. It is also true that Hurajt, the decedent, did not himself operate the tank, but he was, as a roadman, compelled to work within the range of its operation.

Mr. Moritz, and the other foreman, Mr. Newell, each testified in substance that the valve did not once release while they were on the job. It was never heard to operate, nor was anything in the nature of steam or vapor ever seen to escape from it. Newell testified that it did not release under a pressure as high as 80 pounds and Moritz testified that he complained of the valve to his superintendent. From this testimony we think a clear inference arises that the valve was closed by the plug when the tank was delivered to the county and that the obstruction remained until the accident. In addition it was proved that appellant kept similar plugs on hand for use in blowing out the tanks after they had been on a job and appellant introduced a photograph of a duplicate of the tank involved and we think a jury might reasonably conclude that in the photograph offered the vent of the valve was closed by a plug.

■ Appellant urges that the court erred in instructing the jury that it was required to furnish and maintain throughout the performance of the work called for by the contract a pressure distributor or tank which was in a reasonably safe condition and free from defects. The specific charge upon this particular feature is as follows: "As I hold the law, the Barrett Company was not required to supervise the use of this pressure tank by the county, nor did it control the manner of doing the work. It was required only to furnish and to maintain the tank in a reasonably safe condition and free from defects which normally would constitute probable factors of danger, considering the use to which the tank was to be put. It will not be responsible for the dangers resulting from a screw plug in the safety valve unless its agents put it or left it in the valve, or failed to remove it if they knew it was there, or in the exercise of due care in maintaining the tank in a reasonably safe condition could or should have known of its presence and re-

moved it, and unless you do so find from the greater weight of the evidence, the defendant could not be held for such condition or a resulting explosion due directly to such plugged valve."

The instruction as given was in accord with our view of the law as above indicated. So far as the rights of decedent were concerned, appellant's obligation did not stop with furnishing a reasonably safe tank and sufficient valve. It carried with it a corresponding duty to maintain that condition by inspection and repair.

█ It was not reversible error to exclude the evidence of witnesses that in the performance of the contract between appellant and the county there existed a practice and custom that if tanks under the control of the county needed repairs, the facts should be reported to appellant's superintendent who would make them and that otherwise appellant would be under no obligation to inspect or repair. Such evidence was irrelevant. The course of dealing between appellant and the county under their contract would not avoid appellant's responsibility to the decedent, a third party, for its own negligence.

Judgment affirmed.