## Doyle, Appellant, *v.* South Pittsburgh Water Company.

Argued October 1, 1963. Before MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*James R. Hornick,* with him *Clair V. Duff,* for appellants.

*James F. Manley,* with him *Burns & Manley,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, March 17, 1964:

On December 31, 1961, the home of the plaintiffs in this case, Robert A. Doyle and his wife Frances P. Doyle, was destroyed by fire. The destruction could have been averted if the Pittsburgh Fire Department, which had responded to the fire alarm, could have obtained water from the fire hydrants, of which there were at least five in the immediate area of the house. None would yield a stream of water for the hoses ready to carry the extinguishing element to the flames which began small but eventually leaped to proportions which engulfed and consumed the dwelling.

On September 18, 1962, the plaintiffs filed in the Court of Common Pleas of Allegheny County a complaint in trespass against the South Pittsburgh Water Company averring that it was under contract to provide water for fire hydrants in the vicinity of their dwelling and to maintain those hydrants for use in emergencies for the sole purpose of fighting fires in and about the vicinity of the plaintiffs' home. The complaint charged the water company with certain acts of negligence which individually or collectively caused the destruction mentioned. The water company filed preliminary objections in which it simply said that the plaintiffs had failed to set forth a cause of action upon which relief could be granted, and moved for an order dismissing the complaint. The court sustained the objections and entered judgment for the defendant. The plaintiffs have appealed.

In their complaint the plaintiffs enumerated the items of negligence attributed to the defendant. Since the defendant demurred, the averments in the complaint will be accepted as established fact. The com-

plaint states that the defendant allowed the water in the crucial hydrants to freeze so that they became useless for fire-fighting emergencies; that it failed to inspect the hydrants, failed to maintain sufficient pressure in the hydrants, failed to replace or repair inoperative valves and, inter alia, failed to notify the plaintiffs or the Pittsburgh Fire Department that the hydrants were inoperative.

In arguing before this Court, the water company asserts that it was not the lack of water which destroyed the plaintiffs' home—it was the fire. This is like saying that a person who starves to death dies not because of lack of food but because of physical debility. The plaintiffs specifically charge in their complaint that had the defendant supplied water, their home would not have gone up in flames. This is the charge the defendant must answer to and nothing is gained by the elusive debating dialectic that it was the fire and not the lack of the drenching element which caused the loss of which the plaintiffs complain.

In attempted support of its argument that the lack of water was too remote to be a proximate cause for the plaintiffs' losses, the defendant cites the case of *Grant v. Erie,* 69 Pa. 420, and says: "The basic and fundamental issue before your Honors is what is the proximate cause of plaintiffs' loss, the fire or the failure of water? This precise question was answered by this Honorable Court in the case of Grant v. Erie, 69 Pa. 420, where it was clearly held that the proximate cause of the damage was the fire and the remote cause was the lack of water."

In that case the municipality of Erie was authorized by the burgess and councils of the borough " 'to make and establish a sufficient number of reservoirs to supply water in case of fire.' " The reservoirs were erected but were allowed to fall into decay and, as a consequence, properties belonging to the plaintiff were de-

stroyed by fire because there was no water in the reservoirs to extinguish the flames. The appellee here says in its brief that this Court, in the *Erie* case, said: " 'In this case it was neither the reservoir nor the amount of water in it that caused the fire. It was caused by something else than that, and *whether the ultimate loss was caused by the want of water leads us too far into the region of possibility and conjecture to enable any one to say, with any certainty, that such loss can be traced directly to the want of water.*" Emphasis supplied by appellee's counsel.)

In offering this quotation, appellee's counsel reveals more resourcefulness than discovery because this Court did *not* make any such statement. The cited quotation was taken from the charge of the trial court which was not approved by this Court. In fact, this Court said much to the contrary of that alleged by the appellee, namely, "The purpose of the reservoir being to extinguish fires, and the fire having been shown not to have been extinguished in consequence of the non-performance of the duty imposed, *it would be no answer, perhaps, to say that the proximate cause of the injury was the fire, and the want of water only the remote cause.* If it were made the duty of a municipality to station a police officer at a particular corner, to protect the foot-passengers from being run over by passing vehicles, it may be doubted whether it would be an answer to an action, to say that the cause of the injury was the horse and wagon and not the absence of the officer." (Emphasis supplied here.)

The decision in the *Erie* case turned on a factor entirely absent in this case, namely, that the municipality was given only a discretionary authority to build the reservoirs and, therefore, no legal duty was imposed on it to build the reservoirs.

In the case of *Eagle Hose Co. v. Elec. Light Co.*, 33 Pa. Superior Ct. 581, a fire horse, belonging to the

plaintiff hose company, was killed when it stepped on an electric wire after an arc lamp, to which the wire was attached, fell to the ground because the lamp had been held in place by a hemp rope which had been consumed by the conflagration the fire company was fighting. The plaintiff contended that in using a rope, instead of a fireproof device, the electric company committed an act of negligence which resulted in the horse's death. The trial court entered a nonsuit against the plaintiff, asserting that the proximate cause of the injury was the burning of the rope, due to a casualty which the defendant was not reasonably bound to foresee. The Superior Court reversed, declaring: "While the burning building may be treated as an inevitable accident so far as the defendant company is concerned, in that they were not in any manner identified with the cause of the fire and had no control over it, it may at least be treated as an intervening agency which brought into dangerous prominence that which a jury might find was a negligent act of the defendant, and so combined with it as to cause the plaintiff's damage. If this should be so determined against the defendant company it will be sufficient ground on which to base a verdict in the plaintiff's favor. . . . The precautions which were reasonably necessary to protect the arc lamp in its place, and whether the company failed to adopt an appliance which was recognized as safer than the one he had had in use, and was well known to be of such a character, and in general use in the community prior to the happening of this accident, was a question for the jury."

Similarly in the case at bar, the question as to whether the water company used appropriate care in maintaining the water hydrants so they would not freeze or otherwise become inoperable was a question of fact for the jury.

Did the water company, by failing to properly maintain the hydrants, create a perilous condition? Certainly it could never be said that the fire was an unforeseeable event. Unfortunately, fires are always possible, and the purpose of a fire hydrant, like a Minute Man, is to be ready for fires at all times. It would be wholly unrealistic to say that the water company was not to anticipate the likelihood of a fire, in which event its failing to keep the hydrants and their appurtenances in proper repair could result in the very loss which occurred and in the very manner it occurred. Thus, the defendant cannot avoid liability merely by asserting that the fire and not the defendant's negligence was the proximate cause of the plaintiffs' loss. What was said in *Stark v. Lehigh Foundries, Inc.*, 388 Pa. 1, 11, applies here: " ' " " 'One who negligently creates a dangerous condition cannot escape liability for the natural and probable consequences thereof, although the innocent act of a third party may have contributed to the final result.' And when there are two contributing acts, it is not proximity in time that determines which of them is the proximate cause of the resulting injury:" *Mars v. Meadville Telephone Co.*, 344 Pa. 29, 31. . . . In determining whether an intervening force is a superseding cause, the Supreme Court in Hendricks v. Pyramid Motor Freight Corp., 328 Pa. 570, 574, stated: "The answer to this inquiry depends on whether the (intervening) conduct was so extraordinary as not to have been reasonably foreseeable, or whether it was reasonably to be anticipated . . ."

" ' "The question of what is the proximate cause of an accident is almost always one of fact for the jury:" Ashby v. Phila. Electric Co., [328 Pa.] 479; Helmick v. South Union Twp., 323 Pa. 433, 439; Murray v. Pittsburgh Athletic Co., 324 Pa. 486, 493; Restatement, Torts, sec. 447.' "

The defendant company next contends that it owed no liability to the plaintiffs because it was under no duty to supply them with water. To support this thesis it cites the case of *Thompson v. Springfield Water Co.*, 215 Pa. 275, where this Court stated that since the municipality there involved had no duty to supply water to the plaintiffs, its agent, the water company, acting for and in behalf of the municipality, similarly had no such duty. We need not say whether under similar facts that decision would today be followed. It is sufficient to state that in the *Thompson* case, the Court proceeded on the theory that undertaking the task of supplying water to the plaintiff, as in *Grant v. Erie,* supra, was discretionary with the municipality and that therefore it could not be held liable for failing to exercise a discretionary duty.

The plaintiff's claim in the *Thompson* case was based on the insufficiency of available hydrants near the plaintiff's property and the Court viewed the claim as being one of a breach of duty to supply water. Here the situation is entirely different. The plaintiffs are not relying on the defendant's breach of duty to supply water but on its breach of a duty to use reasonable care in the operation and maintenance of a water system which the defendant had in fact set up in the vicinity of the plaintiffs' property.

Thus, the water company is not charged with the failure, through the municipality, to perform an act, which the court in the *Thompson* case said was a discretionary act. The municipality here did exercise its discretion and no one challenges that exercise. As a result of the fulfillment of that choice of action, hydrants were actually set up in the vicinity of the plaintiffs' property—five of them. Hence, the situation in the case at bar is far further advanced than the one outlined in the *Thompson* case. Discretion having been exercised and the physical fact of that exercise having

become a fait accompli, reasonable care in the maintenance and repair of the planted hydrants became imperative. The failure to use that care is what the defendants are being charged with, not merely a breach of duty to supply water because of the defendant's contract with the municipality.

The duty which the defendant company owed to the plaintiffs under the facts averred in the complaint arises from the law and not from its contract with the Borough.

The physical situation in the case at bar and the facts evolving therefrom bring this litigation squarely within the rule that where a party to a contract assumes a duty to the other party to the contract, and it is foreseeable that a breach of that duty will cause injury to some third person not a party to the contract, the contracting party owes a duty to all those falling within the foreseeable orbit of risk of harm. The landmark in this field of the law is the well-known *MacPherson v. Buick Motor Co.*, 217 N.Y. 382, where the opinion was written by Judge CARDOZO.

In that case the defendant manufactured an automobile which it sold to a retail dealer who in turn sold it to the plaintiff. While the car was in movement, one of its wheels, being made of wood and defectively constructed, crumbled, and the plaintiff was thrown out of the car and injured.

He sued the manufacturer, Buick Motor Company, which defended on the basis that it had no contract with the plaintiff and therefore owed him no duty. The Court of Appeals of New York rejected this defense and held: "If the nature of a thing is such that it is reasonably certain to place life and limb in peril when negligently made, it is then a thing of danger. Its nature gives warning of the consequences to be expected. If to the element of danger there is added knowledge that the thing will be used by persons other

than the purchaser, and used without new tests, then, irrespective of a contract, the manufacturer of this thing of danger is under a duty to make it carefully."

To erect fire hydrants close to dwellings is to assure the inhabitants of those homes that potential fire engines stand guard to fight an invading conflagration. To erect fire hydrants and then not inspect them with some reasonable regularity is like setting sentinels and then offering them no relief or food so that they fall over from exhaustion and thereby become useless as watchful guardians. With fire hazard, unceasing vigilance is not only desirable but mandatory. As stated by Judge CARDOZO in the MacPherson case: "The presence of a known danger, attendant upon a known use, makes vigilance a duty. *We have put aside the notion that the duty to safeguard life and limb, when the consequences of negligence may be foreseen, grows out of contract and nothing else.* We have put the source of the obligation where it ought to be. We have put its source in the law." (Emphasis supplied.)

The New York Court of Appeals rejected the argument of the defendant that it owed a duty only to the dealer who purchased the car originally: "The defendant would have us say that he [the dealer] was the one person whom it was under a legal duty to protect. The law does not lead us to so inconsequent a conclusion. Precedents drawn from the days of travel by stage coach do not fit the conditions of travel today. The principle that the danger must be imminent does not change, but the things subject to the principle do change. They are whatever the needs of life in a developing civilization require them to be."

Could the needs of domiciliary life require anything more vitally than proper fire protection? Could anything be more cruelly deceptive than fire hydrants which do not function? Could there be a greater lapse of care than to fail to properly inspect and maintain

fire hydrants once they have been established and the community has accepted them as being live guardians and not mere painted cast iron?

The Buick Motor Company in the *MacPherson* case attempted to draw a distinction between things inherently dangerous and things imminently dangerous. Judge CARDOZO said: "The case does not turn upon these verbal niceties. If danger was to be expected as reasonably certain, there was a duty of vigilance, and this whether you call the danger inherent or imminent."

Returning to the proposition that the defendant auto manufacturer was liable to the person who was injured even though it had not dealt with that person, Judge CARDOZO said: "There is nothing anomalous in a rule which imposes upon A, who has contracted with B, a duty to C and D and others according as he knows or does not know that the subject-matter of the contract is intended for their use."

He noted that that principle of law had been accepted in England decades before: " 'Whenever one person supplies goods, or machinery, or the like, for the purpose of their being used by another person under such circumstances that every one of ordinary sense would, if he thought, recognize at once that unless he used ordinary care and skill with regard to the condition of the thing supplied or the mode of supplying it, there will be danger of injury to the person or property of him for whose use the thing is supplied, and who is to use it, a duty arises to use ordinary care and skill as to the condition or manner of supplying such thing.' "

The law of Pennsylvania in this phase of the litigation was enunciated as recently as 1961 in *Evans v. Otis Elevator Co.*, 403 Pa. 13. In that case the plaintiff Evans was injured when a board from the roof of the elevator in which he was riding fell on his head. The elevator belonged to the Sperling Company, Evans'

employer, which had a contract with the Otis Elevator Company whereby the latter undertook the responsibility of making periodic inspections of the elevator and accessory equipment. Evans sued the Otis Elevator Company averring that it was negligent in failing to properly inspect the elevator and in failing to notify him of its defective and dangerous condition. Otis defended on the proposition, inter alia, that it owed no duty to Evans, but only to Sperling. This defense was rejected by our Court, Justice BENJAMIN R. JONES stating: "Generally a party to a contract does not become liable for a breach thereof to one who is not a party thereto. However, a party to a contract by the very nature of his contractual undertaking may place himself in such a position that the law will impose upon him a duty to perform his contractual undertaking in such manner that third persons—strangers to the contract—will not be injured thereby: Prosser, Torts, (2nd ed. 1955), section 85, pp. 514-519. It is not the contract per se which creates the duty; it is the law which imposes the duty because of the nature of the undertaking in the contract. If a person undertakes by contract to make periodic examinations and inspections of equipment, such as elevators, he should reasonably foresee that a normal and natural result of his failure to properly perform such undertaking might result in injury not only to the owner of the equipment but also third persons, including the owner's employees: Bollin v. Elevator Construction & Repair Co., 361 Pa. 7, 17, 18, 63 A. 2d 19, and cases therein cited. The orbit of Otis' duty to third persons is measured by the nature and scope of his contractual undertaking with Sperling and, if, as presently appears, Otis undertook to inspect the elevator at regular intervals, and, if the elevator was in a defective or dangerous condition discoverable by reasonable inspection, Otis would be liable to third persons, regardless of any privity of

contract, who might be injured by Otis' failure to properly perform its contractual undertaking of inspection. Such principle finds support in reason, justice and precedent: (citing many cases from other jurisdictions)."

The appellee cites the case of *German Alliance Ins. Co., v. Home Water Supply Co.,* 226 U.S. 220, in support of its position because the Supreme Court of the United States there said: "The courts have almost uniformly held that municipalities are not bound to furnish water for fire protection." But this does not settle the matter here. The quoted matter, with other sentences quoted in the appellee's brief, are merely selected apples out of a barrel which contains other fruit which give to the barrel a wholly different concept of its contents than can be gathered from the one selection made by the defendant company. The Supreme Court did state that there was no duty on the part of the defendant to supply water to the plaintiff because the contract to supply water was with the municipality and not with the public, but it very specifically pointed out that if the failure to supply water had been alleged to be the result of lack of reasonable care in the set-up, maintenance and operation of its water system, the defendant would have been liable: "It is argued, however, that even if, in the first instance, the law did not oblige the company to furnish property owners with water, such a duty arose out of the public service upon which the defendant entered. But if, where it did not otherwise exist, a public duty could arise out of a private bargain, *liability would be based on the failure to do or to furnish what was reasonably necessary to discharge the duty imposed. The complaint proceeds on no such theory. It makes no allegation that the defendant failed to furnish a plant of reasonable capacity, or neglected to extend the pipes where they were reasonably required.* Nor is it charged that what the company actually did was harmful in itself or

likely to cause injury to others, so as to bring the case within the principle applicable to the sale of unwholesome provisions, or misbranded poisons which, in their intended use, would be injurious to purchasers from the original vendee. So that, notwithstanding numerous charges of culpable, wanton and malicious neglect of duty, this suit, whether regarded as ex contractu or ex delicto—is for breach of the provisions of the contract of February 14, 1900, which must, therefore, be the measure of plaintiff's right and of defendant's liability . . .

. . .

"The plaintiff presses these decisions to their logical conclusions and sues—*not for negligence in operating the plant,* but for breach of the contract of construction. The complaint charges that as a direct consequence of the refusal to lay the pipes, *as provided by the contract,* there was no plug near enough to extinguish the fire." (Emphasis supplied.)

The appellee here also depends for nonliability on the case of *Moch Co. v. Rensselaer Water Co.,* 247 N.Y. 160, where the Court's opinion was also written by Judge CARDOZO. In that case the plaintiff's property was destroyed because the defendant water company failed to supply an adequate water supply with sufficient pressure to extinguish a fire, even though the plaintiff had notified the water company of the fire. The Court held that there was no liability. It is to be particularly noted in that case that in its complaint the plaintiff alleged that the water company *failed to* "*fulfill the provisions of the contract between it and the city of Rensselaer.*" (Emphasis supplied.) Here again the claim, entirely different from the one at bar, was predicated on a contract with the involved municipality. No breach of any duty to use reasonable care in the erection, operation and maintenance of the water system was alleged or relied upon. Under these facts,

which, of course, are distinguishable from those in the case at bar, Judge CARDOZO held there was no action ex contractu and no action ex delicto for a common law tort because the defendant's conduct was merely negative in withholding a benefit and it was not tortious. Judge CARDOZO sought to distinguish the *Moch* case from the *MacPherson* case where there was originally no duty toward the plaintiff but such duty arose because of the defendant's action, stating: "If conduct has gone forward to such a stage that inaction would commonly result, not negatively merely in withholding a benefit, but positively or actively in working an injury, there exists a relation out of which arises a duty to go forward (Bohlen, Studies in the Law of Torts, p. 87). So the surgeon who operates without pay, is liable though his negligence is in the omission to sterilize his instruments (cf. Glanzer v. Shepard, supra); the engineer, though his fault is in the failure to shut off steam (Kelley v. Met. Ry. Co., supra; cf. Pittsfield Cottonwear Mfg. Co. v. Shoe Co., 71 N.H. 522, 529, 533); the maker of automobiles, at the suit of some one other than the buyer, though his negligence is merely in inadequate inspection (MacPherson v. Buick Motor Co., 217 N.Y. 382). The query always is whether the putative wrongdoer has advanced to such a point as to have launched a force or instrument of harm, or has stopped where inaction is at most a refusal to become an instrument for good."

He then concluded that there was no liability on the part of the defendant company because: "What we are dealing with at this time is a mere negligent omission, unaccompanied by malice or other aggravating elements. The failure in such circumstances to furnish an adequate supply of water is at most the denial of a benefit. It is not the commission of a wrong."

It must be stated, with some regret, that at this point Homer nodded. Judge CARDOZO, without apparently intending to do so, contradicted what he said in the *MacPherson* case which, incidentally, he cited with approval in the *Moch* case. A refusal to deny a benefit may in itself result in the refusal becoming an instrument of harm. Once Judge CARDOZO recognized that the defendant was guilty of a "negligent omission," he admitted that the defendant had committed a breach of duty since negligence is defined in law as a breach of duty. If there was no breach of duty on the part of the defendant, its conduct could be not characterized as a negligent omission, but would be merely an omission that did not amount to negligence.

It will be recalled that Judge CARDOZO said in the *MacPherson* case: "The presence of a known danger, attendant upon a known use, makes vigilance a duty. . . . We have put the source of the obligation where it ought to be. We have put its source in the law."

Commenting on Judge CARDOZO'S decision in the *Moch* case, Professor Seavey said in 52 Harvard Law Review, 372, 392, that here the distinguished jurist failed to pursue "his accustomed method of facing the realities." Be that as it may, the case before us comes within the principles laid down not in the *Moch* case but in the *MacPherson* case since the plaintiffs here alleged a breach of duty of the water company to use reasonable care in making proper inspection of the water hydrants when such inspection would have revealed their defective condition. Even in the *Moch* case, Judge CARDOZO acknowledged a breach of duty, for, as already noted, he referred to the *MacPherson* case as an example of where the defendant's inaction becomes an actionable tort "though his negligence is merely in inadequate inspection."

The defendant at bar also cites *Reimann v. Monmouth Consolidated Water Co.*, 9 N.J. 134, where the

Supreme Court of New Jersey, with Chief Justice VAN-
DERBILT and Justice HEHER dissenting, held that a pri-
vate property owner has no action against a water
company for failure to provide adequate water to fight
a fire. The reasoning in the *Reimann* case is one
which hardly recommends itself as a homily on ele-
mentary justice. The Majority Opinion advises those
whose houses may be destroyed by fire, either with or
without the negligence of the water company that:
"There are many companies whose function is to in-
sure against fire, and the property owner may protect
himself fully against fire loss by contract with those
companies."

This is similar to saying that persons who may be
injured as the result of gross negligence on the part of
motorists may protect themselves against monetary loss
by purchasing accident insurance and, therefore, there
would be no need to sue the negligent motorists. A
tortfeasor has no right to immunity from liability for
his wrongdoing simply because his victim may, by an
outlay of money, obtain some measure of relief from
the injury done to him by the tortfeasor.

Following to the ultimate the defendant's reasoning
in this regard, it could be said that when one suffers
illness as the result of the tortious conduct of an-
other, he may not recover because he could have taken
out health insurance. That an injured party may ob-
tain insurance does not, under law or by the application
of the simplest logic, insulate a tortfeasor from liabil-
ity for his misconduct.

And then, if householders may buy fire insurance
to recoup their fire losses, why may not water com-
panies buy liability insurance to recompense them for
what they owe to others who have been injured through
their negligence? Railroads, power companies, canal
companies, factory, mill and mine owners, and practi-
cally every large business concern dealing with the

public buy liability insurance. Why should water companies not anticipate the possibility of their negligence whereby, because of the absence of water, an annihilating conflagration could level a town, or, by lack of inspection, the population of a community could be poisoned by contaminated water?

In the New Jersey *Reimann* case the Majority Opinion said further that if water companies were liable for acts of negligence in failing to supply water to combat fires, many of them would be bankrupted or they would be left "insufficiently financed to meet the general needs of their communities." This is a strange explanation to unfold in a court of law. Responsibility in law does not depend on the thermometer of the tortfeasor's exchequer. Any legal entity which commits a wrong is bound by law to restore the injured person to status quo, to the extent that that is possible, regardless of what the malfeasant may have to undergo in accomplishing that act of justice. Equality under the law does not mean parity of bankbooks between the evil doer and his victim. If a company which has committed a palpable wrong cannot meet its responsibilities except by going out of business, it might well be out of business, so far as the general need and general good of the community is concerned.

Something possibly could be said about the practicality of shielding water companies from heavy financial burdens in their infancy as indeed all enterprises aimed at developing the resources of this country and encouraging business got reassuring concessions from government and society in the early days of America, but water companies have left their cradles long ago and must accept adult responsibility as all other public utilities are required to shoulder it. The argument that to insure safety to the public would entail great expense is, and should no longer be, a defense where a duty to life, limb and property is inherent.

Depressing as the reflection may be, it is true nevertheless that the absence of financial responsibility for negligence is to encourage further negligence. To announce to water companies throughout the Commonwealth that no species of indifference on their part, no negligence, no matter how gross, will call for pecuniary answerability is to invite progressive inattention and indifference to protection against the scourge of flame and incendiary invasion.

The immunity which the New Jersey decision promulgates, and on which the defendant principally stands, cannot avail against the most rudimentary test of logic. In several cases decided by our Pennsylvania courts, liability, even on the part of the municipality, for damage done through broken or damaged pipes and hydrants was imposed. If liability attaches to a municipal corporation which is a non-profit entity, it attaches a fortiori to a water company which is strictly a profit-making organization.

In *Luterman v. Philadelphia,* 396 Pa. 301, the plaintiff's property was severely damaged when water from a broken fire hydrant flooded his premises. The jury found an absence of negligence and this court affirmed the finding, but it in no way suggested that the plaintiff had no right to bring this action.

In *McHale v. Throop Borough,* 13 Pa. Superior Ct. 394, the plaintiff suffered damage to his property when the municipality failed to make adequate repairs to a broken fire hydrant and, as a result, water flowed onto his property. A verdict against the borough was affirmed.

In *Boyle v. Pittsburgh,* 145 Pa. Superior Ct. 325, a verdict against the City of Pittsburgh was sustained when the City failed to repair a broken water pipe which was connected with a fire hydrant on the sidewalk and, in consequence the plaintiff's property was damaged.

In all these cases fire hydrants in one way or another were principal actors. It cannot be argued, therefore, that merely because a hydrant appears upon the scene the company serving that hydrant is immune from liability as a result of a negligent act in connection therewith. Suppose, while a broken hydrant (as a result of the water company's negligence) is cascading water onto the property of A, the building of B, which is next door, catches fire and, because of the damaged hydrant, the fire hoses cannot be attached and B's building burns to the ground. A's property has been flooded with water and he sues the water company and recovers damages for the losses sustained. B's building has been completely destroyed as the result of the same negligence, but, according to the defendant's argument here, B may not recover. Such a bizarre differentiation should not be in the law books to arouse the derision not only of foreign observers, but of all disciples of justice in America. It is a differentiation which could not satisfy the most elementary mind in the kindergarten of logic or the most forgiving person in the Sunday School of legal-moral responsibility.

The Majority Opinion in the *Reimann* case, further conjuring up disastrous results for water companies if, like everybody else, they are held responsible for their acts of negligence, said: "If such a broad liability as that sought by the plaintiff were established, the ensuing litigation would doubtless be great . . . no one can foretell the degree of confusion which would follow so revolutionary a decision; a decision which would work backward as well as forward; it would unsettle the past as well as be effective in the future."

Throughout the entire history of the law, legal Jeremiahs have moaned that if financial responsibility were imposed in the accomplishment of certain enterprises, the ensuing litigation would be great, chaos would

reign and civilization would stand still. It was argued that if railroads had to be responsible for their acts of negligence, no company could possibly run trains; if turnpike companies had to pay for harm done through negligence, no roads would be built; if municipalities were to be financially liable for damage done by their motor vehicles, their treasuries would be depleted. Nevertheless liability has been imposed in accordance with elementary rules of justice and the moral code, and civilization in consequence, has not been bankrupted, nor have the courts been inundated with confusion.

The plaintiffs in the case at hand charge the defendant water company with ignoring the most fundamental standards of safety, thus not only causing the destruction of the plaintiffs' property but endangering the lives of the population of the community. The company knew that water freezes in severe winter weather, yet it made no inspection to make certain that the water in its mains was liquid, it made no inspection to determine whether the valves of the hydrants functioned so that water would pour into the fire-fighting equipment which could any day, hour or minute, be summoned to combat the most dreaded calamity in civilian life. A decision which would allow a water company in such a situation to shrug away its responsibility by not even being required to answer the serious charges brought against it, would be a decision not of law and justice but of arbitrary unconcern for the law as established, it would be an ignoring of justice as understood in America and it would be a defiance of honesty and fairness which is always part of the legal code.

Chief Justice VANDERBILT of the Supreme Court of New Jersey filed in the *Reimann* case a dissenting opinion which appeals to logic and common sense. He said: " 'Negligence law is common law, and the com-

mon law has been molded and changed and brought up-to-date in many another case. Our court said, long ago, that it had not only the right, but the duty to re-examine a question where justice demands it' . . .

" 'We act in the finest common-law tradition when we adapt and alter decisional law to produce common-sense justice.' "

As to whether the defendant water company would be immune from liability on the theory it was performing a governmental function as servant of the municipality by which it was employed, we need merely note that neither plaintiff nor defendant has pleaded any such master-servant relationship. Moreover, a finding of an independent contractor-principal relationship could be supported by the facts alleged in the complaint. Hence, if there was any immunity to be enjoyed by the municipality, and we need not decide that issue here, it would not be available to the independent contractor, as we clearly stated in *Ference v. Booth and Flinn Co.*, 370 Pa. 400: "It is hornbook law that the immunity from suit of the sovereign states does not extend to independent contractors doing work for the state."

We hold, therefore, that the plaintiffs' complaint does set out a good cause of action against the defendant water company and that the preliminary objections thereto should not have been sustained.

Judgment reversed.

———

CONCURRING OPINION BY MR. JUSTICE ROBERTS:

I concur in the result because the complaint alleges negligence in the failure to inspect the hydrants and to replace or repair inoperative valves and in allowing the water in the hydrants to freeze.

Mr. Justice EAGEN joins in this opinion.

DISSENTING OPINION BY MR. JUSTICE JONES:

I dissent from the views expressed and the conclusion reached in the majority opinion which (a) effect a completely unwarranted change in the law, (b) eliminate the tort immunity of a municipality and its agent while in the performance of governmental functions, (c) render justiciable an ex delicto action by persons to whom no duty of care is owed, and (d) recognize the nonfeasance of a contractual obligation as the basis of an ex delicto action at the instance of strangers to the contract.

The instant tort action is against a private water company for its alleged failure to properly and adequately maintain certain fire hydrants in the City of Pittsburgh as a consequence of which failure water was not available, when needed, to successfully combat a fire in plaintiffs' home. As this Court stated in *Thompson v. Springfield Water Company*, 215 Pa. 275, 279, 64 A. 521: "What the water company undertook and agreed to do was in the nature of a public function; that is to say, it was something that the municipality, if it chose, could have done at public expense in the exercise of rightful authority. Presumably from considerations of economy and convenience, instead of establishing a municipal water plant with the necessary equipment for the desired purpose, the municipality, by its proper authorities, engaged the [water] company owning an established water plant, to do for the public all that was deemed necessary in this regard. It thereby made the [water company] its agent to discharge for it this particular function, and since the act of the agent in the proper exercise of authority is the act of the principal, a correlative must be, that in doing the act no higher or other duty—we are now speaking of legal public duty—can rest on the agent than would have rested on the principal in the performance of the same service. The case on this point,

therefore, may be considered as though the municipality, and not the agent, were directly involved." The instant water company, in the performance of the service of providing fire hydrants and other facilities for fire fighting, must likewise be regarded as the agent of the municipality in performing this service.

Implicitly in the case at bar and explicitly in *Malter v. South Pittsburgh Water Company*, 414 Pa. 231, 198 A. 2d 850 (handed down this date), the majority opinion takes the position that, inasmuch as a municipality, or its agent, the water company, when it maintains a water system for supplying water to its inhabitants or individual consumers is performing a *proprietary* function,[1] the municipality, or the water company, when it employs such water system for the supplying of water for fire-fighting purposes retains such *proprietary function*.[2] The majority opinion would make no distinction whatsoever between the character of the function of the water system when it furnishes water for domestic and household use and when it is employed as a vehicle to bring water to the scene of a fire. In its failure to recognize such distinction, the majority errs. As presently relevant, the purpose of the water system vis-a-vis the plaintiffs was the public and governmental function of fire fighting and not its proprietary function of supplying water

---

[1] *Durham Terrace v. Hellertown Borough Authority*, 394 Pa. 623, 148 A. 2d 899, aff'g. 16 Pa. D. & C. 2d 231; *Helz v. Pittsburgh*, 387 Pa. 169, 173, 127 A. 2d 89; *Lehigh Water Company's Appeal*, 102 Pa. 515, 528; *City of Philadelphia v. Gilmartin*, 71 Pa. 140; *Penn Iron Co. Ltd. v. City of Lancaster*, 25 Pa. Superior Ct. 478, 482, 483.

[2] The majority suggests that the case at bar falls within the rule in *Jolly v. Monaca Borough*, 216 Pa. 345, 65 A. 809. In *Jolly*, the sole issue was the right of a municipality, supplying water to its inhabitants for domestic use, to charge for such use; no question was therein raised as to the capacity in which a municipality acts when it provides water for fire-fighting purposes. See: *Canavan v. Mechanicville*, 229 N.Y. 473, 128 N.E. 882, 883.

for domestic use; while directed to fire fighting, the proprietary aspect of the water system became dormant to meet the emergency of the fire.[3] The water system cannot be regarded as permanently and irreversibly frozen into a proprietary function simply because the municipality or its agent also use the water system for proprietary purposes. That the supply of water for fire fighting constitutes a public or governmental function on the part of the municipality or its agent is clearly established: *Thompson v. Springfield Water Company,* supra; *Scibilia v. Philadelphia,* 279 Pa. 549, 552, 553, 124 A. 273.

Engaged in a governmental function, a municipality is, and should be, immune from tort liability (*Scibilia v. Philadelphia,* supra, wherein it was said: "the fighting of fires in large cities was not, until comparatively recent years, treated as a matter for direct governmental control, but its status as a public function is now well settled". (p. 559); *Anderson v. Philadelphia,* 380 Pa. 528, 530, 112 A. 2d 92; *Pintek v. Allegheny County,* 186 Pa. Superior Ct. 366, 371, 142 A. 2d 296) and such immunity should extend to a water company when it is performing, on behalf of the municipality, a governmental function. Under the majority ruling neither the municipality nor its agent, the water company, would enjoy any such immunity in performing the governmental function of fire fighting. The attempt by the majority to justify such ruling on the ground that, once either the municipality or the water company utilize the water system for proprietary purposes, then the water system must always be considered a proprietary function even when used for fire fighting, finds no support either in law or logic. The overwhelming weight of authorities and the ne-

[3] Cf. *Herlihy Mid-Continent Company v. Bay City,* 293 F. 2d 383.

cessity that a municipality and its agents be freed from legalistic niceties in proceeding in the performance of public functions dictate a result contrary to that reached by the majority in this case.[4] If the majority opinion prevails, then our legislature should act promptly to retrieve our municipalities and their agents from the result of this decision. However, in the case at bar, I do not believe that either the water company or its principal, the municipality, need retreat behind the shield of governmental tort immunity in order to prevent a recovery because neither should legally be liable ex delicto in any event.

In attempting to justify actionable negligence in the case at bar, the majority opinion places great reliance on *MacPherson v. Buick*, 217 N.Y. 382, and would expand its ruling to a point far beyond that which the writer of the *MacPherson* opinion (the late Judge CARDOZO) chose to go in *Moch Company v. Rensselaer Water Company*, 247 N.Y. 160, 159 N.E. 896.[5] That which Judge CARDOZO grappled with in *Moch*, and that which the majority opinion now sidesteps, is the problem of finding the existence of a *duty* on the part of the water company running to an individual whose home was destroyed by fire. It is completely unnecessary to belabor the obvious—as does the majority opinion—that

---

[4] *German Alliance Insurance Co. v. Home Water Co.*, 226 U.S. 220, 227, 228, 33 S. Ct. 32; McQuillin, Municipal Corporations (3rd ed. rev.), §§53.52, 53.53, 53.104, 53.105, 53.106 and cases therein cited.

[5] The majority opinion states that Judge CARDOZO "nodded" in *Moch*, in that, while he characterized the water company's conduct as "negligent omission", at the same time he failed to find any "breach of duty". Judge CARDOZO declared in *Moch* that, even though there had been reckless or wanton negligence by the water company, there might be difficulty in finding liability in the absence of a breach of duty. It is obvious that it is the majority of this Court which now "nods" in its equation of "negligent omission" with "breach of duty".

fire hydrants, no matter how negligently maintained, do not *cause* fires. At the same time, it is highly significant that the majority fails to spell out wherein *any* duty was owed to plaintiffs by the water company. The rationale of *Moch* as to whether a cause of action lies in tort against a water company by an individual whose property has been destroyed by fire when the water company, either through lack of pressure, failure to properly maintain the fire hydrants, etc., fails to provide adequate water to fight the fire may be summarized: (a) "Given a relation involving in its existence a duty of care irrespective of a contract, a tort may result as well from acts of omission as of commission . . . ." (898); (b) the search is to ascertain "not so much the conduct to be avoided when the relation and its attendant duty are established as existing" but "the conduct that engenders the relation" (898); (c) if the "conduct" has reached a stage that would "commonly result, not negatively merely in withholding a benefit, but positively or actively in working an injury, there exists a relation out of which arises a duty to go forward", such as in *MacPherson*; (d) the crux of the inquiry is whether the actor has reached the point "as to have launched a force or instrument of harm, or has stopped where inaction is at most a refusal to become an instrument for good" (898). Applying that rationale to the situation where a home is destroyed by fire by reason of the water company's failure to supply water for fire fighting, the Court said that the water company, under its contract with the municipality to furnish water for fire fighting, was not brought into such a *relation* with every inhabitant of the city who might potentially be benefited through such water supply as to raise "negligent performance" by the water company to "the quality of a tort" and that the fault of the water company was the "denial of a benefit", not

"the commission of a wrong" (899).[6] As *Moch* indicates, *MacPherson* does not aid plaintiffs.[7]

The distinction drawn in *Moch* is by no means novel. In *Elsee v. Gatward* (1793), 5 Durnford & East's 143, 150, 101 Eng. Rep. 82, 86, it was said: " 'The distinction is this: If a party undertake to perform work, and proceed on the employment, he makes himself liable for any misfeasance in the course of that work; but if he undertake, and do not proceed on the work, no [tort] action will lie against him for the nonfeazance' ."

In the case at bar, the Doyles recognize quite clearly that the basis of the negligence upon which they would predicate the tort liability of the water company is the "contractual agreement" between the water company and the municipality which obligated the former "to provide water for certain fire hydrants in the vicinity of [Doyles'] dwelling and to maintain said fire hydrants for use in emergencies for the sole purpose of fighting fires . . . ." What Doyles contend is that, in breach of said undertaking, the water company did not properly and adequately maintain the fire hydrants to assure the availability of water to fight the fire which threatened Doyles' property. Such failure to do so—the nonfeasance of the contractual obligation—gave rise to no relationship between the water company and Doyles so that such nonfeasance attained

---

[6] As examples of what might result from a contrary holding the Court noted a coal dealer, under contract to supply coal to a shop, would be liable to the shop's customers if coal was not delivered, a goods manufacturer would be liable not only to the buyer but to those looking to the buyer for their sources of supply, etc. The Court noted: "The law does not spread its protection so far". See also: *Spiegler v. School District of City of New Rochelle*, 242 N.Y.S. 2d 430.

[7] *Evans v. Otis Elevator Co.*, 403 Pa. 13, 168 A. 2d 573, relied on by the majority, likewise does not aid the majority's position. Cf. *Wroblewski v. Otis Elevator Co.*, 193 N.Y.S. 2d 855, 856.

the "quality of a tort". In *Hart v. Ludwig,* 347 Mich. 559, 79 N.W. 2d 895, the Court held that a defendant was not liable in tort for a refusal and neglect to care for and maintain an orchard as promised in an oral agreement with the orchard owner because, as in *Moch,* a remedy was sought in tort for nonfeasance of this contract. Having exhaustively reviewed authorities in other jurisdictions, that Court concluded: "The division thus made, between misfeasance, which may support an action either in tort or on the contract, and the nonfeasance of a contractual obligation, giving rise only to an action on the contract, is admittedly difficult to make in borderland cases. There are, it is recognized, cases in which an incident of nonfeasance occurs in the course of an undertaking assumed. Thus, a surgeon fails to sterilize his instruments, an engine fails to shut off steam [citing a case], a builder fails to fill a ditch in a public way [citing a case]. These are all, it is true, failures to act, each disastrous detail, in itself, a 'mere' nonfeasance. But the significant similarity relates not to the slippery distinction between action and nonaction but to the fundamental concept of 'duty'; in each a situation of peril has been created, with respect to which a tort action would lie without having recourse to the contract itself. Machinery has been set in motion and life or property is endangered. . . . In such cases, in the words of [Tuttle v. Gilvert Mfg. Co., 145 Mass. 169, 13 N.E. 465], we have a 'breach of duty distinct from contract.' Or, as Prosser puts it (Handbook of the Law of Torts [1st ed.], §33, p. 205), 'if a relation exists which would give rise to a legal duty without enforcing the contract promise itself, the tort action will lie, otherwise not'. Before us, however, we have not such a case. We have simply the violation of a promise to perform the agreement. . . . What we are left with is defendant's failure to complete his contracted-for performance. This is

not a duty imposed by the law upon all, the violation of which gives rise to a tort action, but a duty arising out of the intentions of the parties themselves and owed only to those specific individuals to whom the promise runs. A tort action will not lie." Negligence is the basis of a tort action; a mere breach of a contractual promise will not suffice. Distinct from a breach of contract, a breach of duty must be shown and such breach of duty is absent in the case at bar.

Another essential infirmity in the majority's position is that it does not consider *what duty,* if any, is owed by the water company to the plaintiffs. It is not enough to say, as does the majority say inferentially, that the duty is to be found in the law and cite *MacPherson* as authority. In *Palsgraf v. Long Island R. Co.,* 248 N.Y. 339, 162 N.E. 99, it was said: "Negligence is not actionable unless it involves the invasion of a legally protected interest, the violation of a right. 'Proof of negligence in the air, so to speak, will not do' [citing authorities]" (99) and "back of [any given] act must be sought and found a *duty* to the individual complaining, the observance of which would have averted or avoided the injury" (pp. 99, 100). (Emphasis supplied). To paraphrase *Palsgraf,* Doyles must sue in their own right for a wrong personal to them, and "not as the vicarious beneficiar[ies] of a breach of duty to another" (100). When a person enters into a contractual undertaking, he intends to benefit the other contracting party and such persons as may properly be classified as third parties specifically intended to be benefited. The majority of this Court, inferentially, would read into the water company-municipality contract an intent to benefit all who might, by incidence, be benefited thereby. As was said in *Moch,* supra (897) : "In a broad sense it is true that every city contract, not improvident or wasteful, is for the benefit of the public. More than this, however,

must be shown to give a right of action to a member of the public not formally a party. The benefit, as it is sometimes said, must be one that is not merely incidental and secondary. Cf. Fosmire v. National Surety Co., 229 N.Y. 44, 127 N.E. 472. It must be primary and immediate in such a sense and to such a degree as to bespeak the assumption of a duty to make reparation directly to the individual members of the public if the benefit is lost. The field of obligation would be expanded beyond reasonable limits if less than this were to be demanded as a condition of liability. . . . By the vast preponderance of authority, a contract between a city and a water company to furnish water at the city hydrants has in view a benefit to the public that is incidental rather than immediate, an assumption of duty to the city and not to its inhabitants. Such is the ruling of the Supreme Court of the United States. German Alliance Ins. Co. v. Homewater Supply Co., 226 U.S. 220, 33 S. Ct. 32, 57 L. Ed. 195, 42 L.R.A. (N.S.) 1000.

. . .

"If the plaintiff is to prevail, one who negligently omits to supply sufficient pressure to extinguish a fire started by another assumes an obligation to pay the ensuing damage, though the whole city is laid low. A promisor will not be deemed to have had in mind the assumption of a risk so overwhelming for any trivial reward."

The only obligation on the part of the water company under the instant circumstances arose from its contract with the municipality to provide water for the fighting of fires in the municipality. The parties never intended that, for a breach of such contracting obligation, a right of action, either ex contractu or ex delicto, would arise on the part of strangers to that contract. Whether averred or not, *any* duty must arise

from the water company-municipality agreement for the supply of water to fight fires and to any such agreement plaintiffs are strangers to whom no duty arose on the part of the water company. However, even if such a duty did arise, certainly the nonfeasance of any such contractual duty cannot furnish the basis of an action ex delicto.

Although severely rejected by the majority, the denial of recovery under the instant circumstances is also based on a sound public policy. The Supreme Court of New Jersey in *Reimann v. Monmouth Consolidated Water Co.,* 9 N.J. 134, 87 A. 2d 325, well stated this public policy: "Water companies sell a commodity and their rates have been established and approved by the Board of Public Utility Commissioners upon that basis, not upon the assumption that, without an undertaking to that end, they are responsible for fire losses. A way of business has grown up on that understanding. . . . Water rates are uniform; they do not rise or fall with the inherent danger. If the principle for which appellant contends were the law there would be no predetermined limit of liability. There are large water companies and small water companies; companies with ample supply of water and companies with limited and inadequate supply and perhaps with inability to increase the water resources; companies of such size that a considerable verdict against them for a fire loss would bankrupt them or leave them insufficiently financed to meet the general needs of their communities. . . .

"If such a broad liability as that sought by the plaintiff were established, the ensuing litigation would doubtless be great. . . . No one can foretell the degree of confusion which would follow so revolutionary a decision; a decision which would work backward as well as forward; it would unsettle the past as well as

be effective in the future." [8]  In my opinion, a sound public policy militates against a recovery in this case, although on such ground alone I would hesitate to base my decision in this case.  See: *Patton v. U.S.*, 281 U.S. 276, 74 L. ed. 854, 50 S. Ct. 253.

In my view, the rationale of *Moch, German Alliance Insurance Co., Thompson v. Springfield Water Company*, supra, and several Pennsylvania authorities[9] control the instant situation.  The present majority opinion marks a complete departure from well-settled principles in this area of the law not only in this Commonwealth but in a vast majority of jurisdictions in this country which have been presented with the instant problem.[10]  Such a departure is completely unwarranted and unjustified.

Mr. Justice COHEN joins in this dissenting opinion.

---

[8] See also:  *Miralago Corp. v. Village of Kenilworth*, 290 Ill. App. 230, 7 N.E. 2d 602, 607; *Gilbertson v. City of Fairbanks*, 262 F. 2d 734, 738, 739.

[9] *Grant v. City of Erie*, 69 Pa. 420; *Beck v. Kittanning Water Co.*, 8 Sadler 237; *Stone v. Uniontown Water Co.*, 16 Pa. C.C. Rep. 329; *St. Mary's Greek Catholic Church of Taylor v. Scranton-Spring Brook Water Service Co.*, 51 Lacka. Jur. 227; *Hudak v. Scranton-Spring Brook Water Service Co.*, 39 Pa. D. & C. 346; *Hay v. Connellsville Water Co.*, 4 Pa. D. & C. 731.

[10] See: 62 A.L.R. 1205. A contrary view is entertained in only three jurisdictions—Kentucky, Florida and North Carolina—; only the latter two jurisdictions recognize a cause of action in tort in this situation.