**Paul E. HARAGAN, father, on behalf of Michael Paul Haragan, and individually, and as Administrator of the Estate of Michael Paul Haragan, deceased, Plaintiff,**

v.

**UNION OIL COMPANY, and Baroid Division of National Lead Company, Defendants.**

**UNION OIL COMPANY, Third-Party Plaintiff,**

v.

**BAROID DIVISION OF NATIONAL LEAD COMPANY and Offshore Fabricators, Inc., Third-Party Defendants.**

**No. A–137–68.**

United States District Court, D. Alaska.

May 15, 1970.

Charles E. Tulin, Anchorage, Alaska, for Haragan.

John M. Conway, Anchorage, Alaska, for Offshore Fabricators, Inc.

Donald A. Burr, Anchorage, Alaska, for Union Oil Co.

Charles W. Hagans, Anchorage, Alaska, For Baroid Div. Nat'l. Lead Co.

Daniel A. Moore, Jr., Anchorage, Alaska, for Offshore Fabricators, Inc.

## MEMORANDUM AND ORDER

VON DER HEYDT, District Judge.

This matter is now before the Court on motion of defendant Baroid Division of National Lead Company for summary judgment. The action is one for wrongful death arising as a result of an accident on board defendant Union Oil Company's offshore oil drilling platform "Grayling" in Cook Inlet, Alaska.

Plaintiff's decedent, Michael Paul Haragan, was an employee of Offshore Fabricators, Inc. On August 20, 1968, Offshore was engaged in construction work on board the platform "Grayling" under a contract with Union. At about 3:20 p. m., Haragan went to the sub-deck of the platform to thread a length of pipe. A dangerous concentration of combustible gas had accumulated in the vicinity of the pipe-threading machine, and when Haragan turned the machine on the gas exploded, causing injuries from which he died on August 23.

Approximately one year before the accident, Union Oil had purchased from Baroid a device called an "Automatic Gas Detection and Alarm System," the purpose of which was to prevent such accidents by giving warning of hazardous accumulations of gas. This system consists basically of a number of "sensing heads," located in various places

about the platform, and a centrally located control panel to which the sensing heads are connected by means of pipe or tubing. It operates by drawing in samples of air through the sensing heads, which samples it automatically tests or analyzes for the presence of combustible gas. If gas is detected, an audible alarm sounds and lights on the control panel indicate the location from which the contaminated air sample was obtained.

Beginning in the fall of 1967 and continuing until the time of the accident, Union experienced considerable difficulty with the device, which was subject to periodic breakdowns caused by the corrosion of certain of its internal parts. The cause of the trouble appears to have been salt ingested into the system through the sensing heads in the form of salt water or spray. Various attempts were made to repair the system and devise some permanent cure for the problem, but without any substantive degree of success.

Plaintiff alleges that the failure of Baroid's device was a proximate cause of his decedent's death, and that Baroid is liable under the alternate theories of negligence, breach of warranty, and strict liability. Baroid urges that the facts of the case will support none of these theories.

It will be necessary to examine each of plaintiff's theories individually. One of Baroid's arguments, however, affects any view of the case the Court might take, and so must first be considered. Baroid contends that the failure of its device cannot be considered a cause of plaintiff's damage because it is an established fact that the machine was not in use for two weeks prior to the accident; that Union, in other words, had turned it off and ceased altogether to rely upon it to detect the presence of gas. A close examination of the available evidence reveals that this contention has not been established as a fact. The depositions of those present on the platform at the time do not reveal when, prior to the accident, the device last ceased to function. Counsel for Union Oil stated in oral argument upon the matter that the daily logs kept aboard "Grayling" do not do so either. It is undisputed that at some time Union did cease using Baroid's device completely, but from the information now available to the Court this might as easily have occurred after the accident as before.

■ Each of plaintiff's theories now must be considered. In order to recover in negligence, plaintiff must, of course, prove the classic elements of duty, breach, causation and damage. Under the circumstances of this case, there is little doubt that Baroid owed a duty to plaintiff's decedent in connection with the alarm system. A number of cases have permitted an employee of a purchaser to recover from a manufacturer of a product which causes injury. *E. g.* Sylvania Electric Products, Inc. v. Barker, 228 F.2d 842 (1st Cir. 1955), cert. denied 350 U.S. 988, 76 S.Ct. 475, 100 L.Ed. 854 (1956). Nor must the employee have actually used the product himself, Barrett Co. v. Bobal, 74 F.2d 406 (6th Cir. 1935). Indeed, mere bystanders have been allowed recovery, Gaidry Motors v. Brannon, 268 S.W.2d 627 (Ky.1954). A leading commentary has said that "the concept is one of foreseeability", 1 Frumer & Friedman Products Liability § 5.03[1] at 36 (1964). Clearly anyone working aboard "Grayling" was within the foreseeable risk of harm from the type of accident Baroid's device was intended to prevent, and which occurred here.

Concerning breach of duty, certainly it cannot be said that there is no issue of material fact as to whether the device was negligently designed or manufactured. Plaintiff's reliance on the alternate theory of failure to warn, however, appears to this Court to be misplaced. The purpose of a warning is to impart knowledge to a user of the dangers inherent in a product. If failure to warn of its product's sensitivity to salt were Baroid's only negligent act, then Baroid's negligence could not have caused plaintiff's damage, as Union knew of the

problem several months before the accident.

The theory of causation presented here is somewhat unusual, but essentially sound. It is true that the failure of defendant's alarm system did not cause the explosion in a physical sense. But there is likewise no doubt that a jury could find that the classic "but for" test of cause in fact is satisfied with regard to Baroid in that it is more probable than not that, had Baroid's product functioned correctly, the accident would not have occurred.

Could the failure of Baroid's device be found to be a proximate or legal cause of plaintiff's damage? In Doyle v. South Pittsburgh Water Co., 414 Pa. 199, 199 A.2d 875 (1964) the failure of a fire hydrant system to function was held to be a proximate cause of the destruction of plaintiff's home by fire. This Court finds no reason why one who manufactures a device intended to prevent damage emanating physically from another source should not be liable if, through his negligence, the device fails to prevent the anticipated harm. It may be of course, that the evidence at trial will show that Union ceased to rely at all on the alarm system so far in advance of the accident as to make Union's negligence (if any) an intervening cause insulating Baroid from liability. But that, as noted above, is a question of fact.

The amount of damages, if any, due plaintiff is of course a question of fact. That plaintiff has made out a prima facie case on the issue of damage is unquestioned. Thus, Baroid is not entitled to summary judgment on plaintiff's theory of negligence.

The Court now turns to the more complex question of warranty. Little doubt exists that warranties were made by Baroid, both express and implied. The question is whether plaintiff can maintain an action on them, there being no privity of contract between plaintiff's decedent and Baroid, at least in the usual sense in which that term is used.

For many years an action on a warranty has been regarded as a contractual remedy, and a contractual relationship between the injured party and the manufacturer or seller has been held essential to recovery. Recently, however, both cases and commentaries have appeared indicating that warranty is not historically a contractual remedy, but one which originally sounded in tort. E. g., Chapman v. Brown, 198 F.Supp. 78, 103 (D. Haw.1961), aff'd 304 F.2d 149 (9th Cir. 1962); Rogers v. Toni Home Permanent Co., 167 Ohio St. 244, 147 N.E.2d 612, 614–615 (1958); Prosser, Torts § 95 at 651–52 (3d ed. 1964); 2 Frumer & Friedman Products Liability § 16.03 [1] (1966). Beginning with Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69 (1960) there has been an increasing trend away from the requirement of privity in many states, and the Alaska Uniform Commercial Code, AS § 45.05.104 (1962) specifically extends the cause of action in warranty to persons in the buyer's family or household, and guests in the buyer's home, who suffer personal injuries by reason of breach of warranty. On the subject of persons other than those named, however, the statute is silent, and neither enlarges nor restricts other applications of warranty. See U.L.A. Uniform Commercial Code § 2–318, Comment 3 (1968). Nor has the Supreme Court of Alaska ruled upon the question, although there is language in Clary v. Fifth Avenue Chrysler Center, Inc., 454 P.2d 244, 248–249 (Alaska 1969) which suggests that that Court would adopt a liberal view of the law of warranty were the question presented.

In other jurisdictions, the cases factually most close to the situation at bar are Hart v. Goodyear Tire and Rubber Co., 214 F.Supp. 817 (N.D.Ind.1963) and Peterson v. Lamb Rubber Co., 54 Cal. 2d 339, 5 Cal.Rptr. 863, 353 P.2d 575 (1950). In each of those, an employee of a buyer corporation, or his estate, was held to have a cause of action against a seller-manufacturer for personal injuries or wrongful death caused by the seller's product.

These cases are couched in the language of privity, and are usually cited

for the proposition that the employee is part of the "industrial family" of the employer, and thus stands in his shoes as far as privity is concerned. *E. g.*, 2 Frumer & Friedman *op. cit.* supra § 16.03 [7].

■ But plaintiff's decedent was not an employee of Union, the buyer in this case. He was employed by Offshore Fabricators, Inc., an independent contractor. No warranties were made to him directly, or to Offshore, his employer. In view of the absence of Alaskan precedent, and also of the fact that *Hart* and *Peterson* do not represent the general rule (if, indeed, there is one), this Court is unwilling to speculate that (1) Alaska would adopt the *Hart* and *Peterson* rule and (2) would extend it to include employees of an independent contractor. The Court therefore holds that plaintiff has no cause of action in warranty.

The Court now turns to the issue of strict liability. In Clary v. Fifth Avenue Chrysler Center, Inc., *supra,* the Supreme Court of Alaska adopted the rule of strict liability in tort for manufacturers of defective products which cause personal injury. The version of the doctrine which the Court approved was that stated in Greenman v. Yuba Power Products, Inc., 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897 (1962), which is as follows:

> "A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being." 27 Cal.Rptr. at 700, 377 P.2d at 900.

Baroid's alarm system was not sold to Union in ready-to-use condition. It was contemplated by the parties to the sale that, after the sale, the device would have to be installed on the platform and tested to assure that it functioned correctly. Such tests were performed. From these facts Baroid contends this was not a product which was to be used without inspection for defects, and so does not fall within *Clary* and *Greenman.*

But if the words "without inspection for defects" are given a strict and literal construction, few products could pass the test. The automobile is one of the most common products to which the rule of strict liability is applied. Yet every automobile purchaser is offered a "test-drive" by his seller; he has at least the opportunity to assure himself that the steering, engine, brakes, etc. are functioning. Such a "test-drive" is in a very real sense an inspection for defects. Even a child buying a toy may open the box and see that all the parts are there, but he will not be denied recovery for that reason if the toy subsequently injures him.

■■ The Court must therefore conclude that "without inspection for defects" means without that type of inspection which would reasonably be expected to uncover the sort of hidden defects that cause accidents. In the case at bar, the defect claimed is that Baroid's alarm system was so designed or constructed that, over a period of time, exposure to salt water or spray caused its internal parts to corrode, and thus cease to give warning of the presence of gas. This is not the type of defect which would be detected by the inspection and test that Union was to conduct, and which Baroid knew would be conducted. Baroid is thus not entitled to summary judgment on the issue of strict liability.

Therefore, it is ordered:

1. That the motion for summary judgment of defendant Baroid Division of National Lead Company is denied;

2. That counsel for plaintiff shall, within twenty days of the date hereof, submit to the Court a proposed order under F.R.Civ.P. 56(d) specifying what material facts exist without substantial controversy in this action and defining the general issues to be tried between plaintiff and Baroid Division of National Lead Co.; that he serve the same upon all defendants, and that defendants have ten days after service to file their comments and objections thereto with the Court, after which such an order will be entered by the Court.